The next case today is Mary Alexandre v. National Union Fire Insurance Company of Pittsburgh. Appeal number 21-1140. Attorney Metsch, please introduce yourself for the record and proceed with your argument. Thank you. May it please the court. I am Lawrence Metsch, counsel for the appellant Mary Alexandre. Good morning. Good morning, your honors. I would ask for two minutes for rebuttal, please. Yes, that's fine. Thank you. This is a real privilege for me to appear in front of this court and I want to thank you for the opportunity to do so. The accidental death policy that was issued to Ms. Alexandre came through her employer, PricewaterhouseCoopers, as a component of an employee benefit plan. Consequently, the plan and the components of it were governed by ERISA, which conferred federal subject matter jurisdiction in the event of a litigated dispute such as this one. So, when the lawsuit was initially filed, it was filed with full knowledge of the fact that because, other than having obtained the policy through her employer, we would end up under the ERISA and in the federal system. The deceased, Mr. on May 18, 2018, after falling from the ninth floor balcony of the Higher Regency Hotel to the lobby, that is nine floors down. His widow, Ms. Alexandre, after exhausting the administrative remedies provided by National Union's parent company, American International Group, filed suit for the accidental death benefits in the U.S. District Court in the with full knowledge of the fact that we were seeking to take advantage of the decision of the 11th Circuit in Horton v. Reliance Standard Life Insurance Company, which is reported at 141 F. 3rd, 1038, decided in 1998 by the 11th Circuit, which was an ERISA matter. In that case, the 11th Circuit held that when you're dealing with an accidental death benefit situation like this, there is a common law presumption, which they adopted in ERISA cases, against suicide and in favor of an accident. But Mr. Metch, you don't really come to grips with the fact that this circuit doesn't have to apply the 11th Circuit law. That's correct. You don't come to grips with the holding in AER Advisors. Well, Your Honor, the AER Advisors is the last in a chain of other courts of appeals decisions holding that the law of the transferee court would apply in the event of a transfer under 28 U.S.C. 1404A. We're aware of that. I was about to mention, Your Honor, thank you for prompting me, that at one point I considered directly asking this court to overrule Wickman, which is like a chicken bone stuck in my throat, because it has a completely different approach to this situation. Wickman was decided eight years before Horton. And as far as I can tell, this court, the First Circuit, has not in any way undermined the Wickman approach. What's particularly troubling about this from our perspective is that, of course, Mr. Muhammad died in Atlanta, Georgia, right in the heart of the 11th Circuit, down the street from the courthouse there. If he had been in the state, if his widow had purchased this policy through an insurance broker outside of her employment, she could have brought suit against the National Union in Georgia in the Georgia State Court, and it could have been litigated there or removed to federal court on the basis of diversity. And the Georgia courts have held that under these circumstances, there is a presumption against suicide and in favor of an accident. The case then got changed. That doesn't help us get around the law of the right. So I was looking ahead and I'm thinking, what do I do now? I'm trying to ask this court, in as polite and diplomatic way as I can, to either overrule Wickman or to limit it to his facts, because Wickman's facts were considerably different than the case here. In that case, in Wickman, the deceased actually survived the fall. And when he hit the ground, he jumped off the bridge. He actually told the rescue people, I jumped. And he asked for his wife. None of that happened here. At least there we had some, there was some evidence, pretty clear evidence, that Mr. Wickman had planned his own death by driving up onto that bridge, driving near the bridge, walking up on top, getting off, hold on by one hand, dropping to the railroad tracks below, and then confirming his intention when he was the subject of medical attention, both at the scene and at the hospital. Counsel, in this case, the district court, in its opinion, made a determination that there was substantial evidence, including the investigative summary and death certificate, of a suicide here. Your Honor, those two reports, one from the coroner and one from the police department, were written by personnel who arrived after the scene, after the incident had occurred and after the death had taken place. The only evidence that came in of what the intention or the state of mind of the deceased was, was the affidavit of the deceased's twin brother, who shared a room with him that night. All the other, the other two, the police department and the medical examiner, yes, they'd be admissible under the rules of evidence as official records or some sort of exception to the hearsay rule, but they knew nothing about this deceased. All they knew is what somebody told them, but they hadn't known him. The evidence that we have was his own brother who gave an affidavit and the text of which is set out in the brief as well. So we have a real issue. If the case had been transferred outside the ERISA regime to the district court in Massachusetts, then the district court would have been bound to apply Massachusetts law, and Massachusetts law has the presumption against suicide and in favor of an accident, and I cited that as well in our briefs. So this is a tragedy not only for Ms. Alexandre and her ability to be compensated on a policy which she paid for, hang because, hang on the distinction between where, where she got it through, uh, through her employer and, um, and the fact that she could have bought it independently and she would have had a much stronger, uh, doctrinal case to recover benefits under the policy for which she had paid to get this protection. So we're asking, uh, the court, uh, so I do notice, and your honor pointed out, Judge Kasper reported out that, pointed out that the district court in its opinion noted that even applying the Horton, uh, presumptions against suicide and in favor of an accident, there was substantial evidence. The only evidence I would just like to confirm is the only evidence of the two reports after the fact from the police and from the coroner. And the only one who was on, well, both of them I assume were on the scene, but they knew nothing about the, uh, the intentions of the deceased. So we have a situation where, um, I don't know where to go with this other than to ask this court either to overrule Wickman, I know the panel probably does not have the authority to overrule the earlier panel decision, or to limit Wickman to the peculiar facts of that case where the deceased actually admitted that he had jumped and complained that no one cared about him. And he asked for his wife and he died in the hospital. He was still alive after he hit the ground. And that confirmed the fact that he had an intent to take his own life. On the contrary, what do you say about the brother's statement that he gave right at the time of the event? Well, I, I really, uh, I, I talked to the brother briefly about that. He was I don't want your off the record conversations. I know. Doesn't that testimony provide substantial evidence for the determination? I mean, it has him, it has the brother yelling, no, don't do it. Well, the, the, the, the deceased was trapped in his planter on the ninth floor. He was, the room was on the 10th floor. He fell one floor into the planter and was wiggling around. So he was arguing, he was telling his brother, don't move, don't move because he was afraid he'd fall off, which he did. He did. Counsel, that's time. Thank you, Ron. Do you want to finish that answer? Judge Kayada? I think, um, we, the situation was that don't do it. Don't do it. It was a call not by the deceased, but by the deceased brother saying, don't move, don't move. He was trapped in the planter and he rolled off the planter onto the floor and he fell nine floors to his death. So there was an accident that he got into the planter and then an accident that he got out of the planter. That's right. Exactly. That's our position. And the evidence compels that finding that you have to argue. Your Honor, this man had everything to live for. He was a Dartmouth graduate. He was an athlete. He had two beautiful children. He'd just gotten a new job. He was there in Atlanta to help his brother move to a new house. He had nothing to take his own life. This I don't know what that means. They obviously, they found marijuana in the deceased bloodstream. I don't know what impact they may have had on him. Sprinting. How far was the sprint? We're talking about if you open the door to that room and there are pictures in the, in the, in the record here, the balcony was right in front of the room, about three feet away from the room door. So there's no sprint involved here. It's just a couple of steps and he fell over the balcony. He ended up in the planter wiggling around. His brother realized what was happening. Erickson, be still, be still. But whatever was in his head, he fell and that was the end of it. But this man had everything to live for. It just doesn't make any sense that he would take his own life where his life was going so well. And certainly he would not have planned a suicide to be with his brother just to ruin his brother's life by going to another city to do it. So there's just nothing here to compel a suicide when a man whose life was on an upward trajectory like this. And we asked the court to help us out. We're caught in a bind. Did you ask the ERISA fiduciary to apply the Massachusetts presumption? Well, it's the same presumption as the Horton presumption. It's the same thing. No, we didn't because we were in the ERISA regime and we argued that the presumption in Horton should govern. And it's the same presumption in the Massachusetts presumption as you'd have in the Horton presumption. It's the same thing. And in the district court, did you argue that Massachusetts law presumption should have been applied? No, we didn't argue that because it was clear that we were in ERISA. We had a preemption problem and it had to govern. So we had this authority from the 11th Circuit, which literally was down the street from the hotel where the man died. So you couldn't get a stronger case for saying that 11th Circuit precedent should apply because that's where the scene of the death was. So it was really remarkable that we had that connection between the death and the 11th Circuit case law. Frankly, the biggest problem I have is we have one statute called ERISA and we have federal appeals courts around the country with similar circumstances coming to completely different results. Some of them, like this court's decision in Wickman, in conflict with all the somebody has to address it. I was hoping this court would. Thank you very much. Thank you, Counselor. Thank you, Attorney Metsch. Please mute your audio and video. Attorney Rose, please unmute your audio and video and proceed with your argument. Good afternoon, Your Honors. Lincoln Rose again on behalf of the Appellee National Union Fire Insurance Company. While this case undoubtedly involves a tragedy, this is not a tragedy that covered under the AD&D policy that's administered by the National Union for two separate but related reasons. First, Your Honors, Mr. Marzouk Mohamed's death was not an accident as that term has been interpreted by the circuit. And secondly, his death falls within the confines of the planned suicide of self-inflicted injury exclusion. As a preliminary matter, the standard of review for this case is under the arbitrary and capricious standard because the plan in this matter grants a clear grant of discretionary discretionary authority upon National Union to interpret the plan and its decisions are conclusive and binding. And because of that clear grant of discretionary authority, the arbitrary and capricious standard applies. And under that standard, as Your Honors know, National Union's decision is upheld if it's supported by substantial evidence in the record. And turning to the first point, whether this whether Mr. Marzouk Mohamed's was an accident, there is substantial evidence as the lower court noted that this was unfortunately was a suicide. First and foremost, the death certificate lists the cause of death as a suicide and that's based upon all the contemporaneous evidence gathered at the scene of Mr. Marzouk Mohamed's death. What's your theory of motive? Your Honor, he just he just woke up one morning and decided to jump off the balcony for no reason? Your Honor, I will not speculate as to as to a motive. Frankly, I do not know and I don't want to speculate. Frankly, in any case involving suicide, it's tragic and it's always, you know, looking in hindsight for a reason. So again, I don't want to speculate. But that's what the Whitman framework is here for is that in cases where a motive is not clear, you have the subjective objective analysis to help guide the court to determine whether this was an accident. And turning to that point, Your Honor, assuming for the sake of the argument that Mr. Marzouk Mohamed's intentions were unknowable, it turns to that objective analysis and using the Whitman framework, which I would point out, Your Honor, had very similar facts to this matter. In that case, the decedent walked into oncoming traffic, hung off of a guardrail and then fell, I believe, 40 feet to his death. The court there, the First Circuit panel there held that he, the decedent either knew or should have known that serious bodily injury or death was likely to occur. And just like here, in any objective analysis, Your Honor, would determine that either serious bodily injury or death would occur from sprinting out a door, somehow falling over the 10th floor balcony into a flower bed and then falling another nine floors down to the atrium. So his motive is where we don't have evidence to it. It's irrelevant where, again, we're guided by the objective analysis set forth in Whitman. So when you're guided by that framework, that even if his motive was unknowable, the evidence here, the death certificate, the contemporaneous accounts from both his brother, Mujahid Mohamed, and the precipient witness in the atrium who heard Mr. Mujahid Mohamed state, no, no, keep still, don't do it, all lead to the conclusion that this was a self-inflicted injury. And again, we're under the arbitrary and capricious standard, which will uphold National Union's decision as long as it's based on substantial evidence, which for these reasons, they are. Additionally, Your Honors, where this is not, this incident would also fall into the policy suicide or self-inflicted injury exclusion. And again, where the cause of death was determined to be a suicide, that there is basis enough for that exclusion to apply. Did the district court pass upon that second exclusion? I think they did, Your Honor. And in doing so, they addressed my brother's argument regarding the presumption against suicide. And they noted that in Horton, which my brother almost relies on exclusively, the panel in Horton held that the presumption only applies if the evidence is inconclusive. And importantly, it's not an unassailable presumption. It is a presumption, so therefore it can be overcome. And the lower court in addressing the exclusion and my brother's argument held that the presumption did not apply because again, the evidence was not inconclusive where the cause of death was determined to be a suicide. So even if there were a presumption against suicide, which this panel has noted there is not in the First Circuit, it would be of no avail to the appellant because one, it would not apply where the evidence is not inconclusive. Have we said that there is no presumption against suicide in the First Circuit or have we said that there's no case on that issue? Forgive me if I misspoke, Your Honor, but I believe it was not determined in Wickman. And I believe in a footnote that panel in Wickman did not address the point, but it has not, I don't believe it has been addressed by this circuit. But one way or the other, it's of no avail to the appellant because it does not apply where the evidence is not inconclusive. And even if it did apply, it would be overcome by the evidence in this case, namely the cause of death being determined to be a suicide, as well as the corroborating evidence from both Mr. Mujahid Mohammed that his brother in the early morning hours squeezed his hand before sprinting out the door, that he said, no, no, don't do it. And that the percipient witness on the atrium heard him say, no, no, keep still, don't do it. Quite apart from the AER advisors is such a critical case here. Going to your argument that the plaintiff waived the governing law doctrine, uh, isn't that rather formalistic since, uh, what the plaintiff, uh, you know, has argued, uh, is that the 11th circuit's presumption against suicide should apply. I would not know, your honor, the circuit's case law is clear that simple citations to, uh, to two cases when underdeveloped arguments are not enough to defeat waiver. And the lower court record shows that there was no argument regarding, uh, the choice of law or governing law. It was the Horton's presumption against suicide, uh, applied to this matter. But even if this were, uh, deemed that, uh, governing law argument to not be waived, uh, it would still fail on its merits because as this, uh, as I believe you noted earlier, your honor, uh, AER advisors are squarely on point and it's held that the law of the transferee court applies. And I believe every circuit that has encountered this issue has, uh, has come up the same way, and it's that the transferee court applies. And I would note that even the 11th circuit, which, uh, my brother argues applies, um, has held to such that the law of the transferee court, uh, would apply. So therefore, even if it's not waived, it's, uh, the, the argument is without merit because the first circuit law in Wickman and its progeny would apply to this matter. Why wouldn't we just apply Massachusetts law, the Massachusetts presumption? Again, again, first and foremost, your honor, we're, uh, governed by ERISA, which is squarely a federal question. And again, well, no, but ERISA, for example, state notice prejudice rules, um, in policies apply in ERISA cases. The Supreme Court's held that. Why wouldn't this presumption apply in ERISA cases? Whether the presumption, whether a presumption applies or not, your honor, I, I, again, I think is of no avail to the appellant where one, the evidence is not inconclusive, uh, and two, again, it's a rebuttable presumption. And even if your honor were, your honors were to apply a, uh, this presumption against suicide, the evidence in this record would overcome any presumption where, again, the cause of death was listed as a suicide and, uh, in the investigative reports support that conclusion, uh, regarding both statements from Mr. Mujahid Mohammed regarding his brother's actions, as well as statements, uh, from Mujahid Mohammed at the scene. Again, no, no, don't do it. And no, no, don't do it. Keep still. So whether you apply a Massachusetts presumption, 11th circuit presumption, or what, uh, whatever presumption, uh, have you, uh, one, it does not apply where the evidence is conclusive and two, it would be rebutted. And, uh, one final, one other point I would like to address your honors, uh, where my brother argued that this was somehow, uh, accidental going over that the, uh, ninth floor flower bed, uh, the, uh, Whiteman case, uh, somewhat dealt with that issue. In the Whiteman case, uh, the, uh, the court held, uh, that a similar exclusion for suicide or self-inflicted injury precluded, um, coverage where the decedent died from autoerotic asphyxiation. And the court there noted that there was no difference between the initial voluntary strangulation and the subsequent, uh, strangulation, which, uh, caused the death and the evidence here. Uh, counsel, that's time. If I just may finish my thought, your honors. Yes. That there was no difference in here. Likewise, the voluntary sprinting out the door, uh, put, put in, in, put in motion, this chain of events. So therefore, uh, that exclusion would still apply where, but for the initial sprinting and going over the 10th floor balcony, he, uh, this would not have occurred. Thank you, your honors. Thank you. Thank you, attorney Rose. Please mute your audio and video at this time. Attorney Mitch, please unmute your audio and video and proceed with your two minutes of rebuttal. Two points I'd like to make your honors. First, that when the Supreme court came out with the notion of, uh, the trusteeship and arbitrary and capricious, uh, they had in mind, I believe a situation where you would have a plan administrator whose own pecuniary fortunes were not at stake, that the administrator was paid a fee to administer a plan, but it was someone else's money. That's not the case here. This is new fix money. And to the extent that the $500,000 may have been reserved as depending on how they did their accounting. And then when the courts here were to deny the claim, that money would come back as a form of profit for the company. It's it's money that they didn't have to pay out of their own pocket. So there's a, did you argue, did you argue below that there was a conflict of interest? Oh, yes, we did. It's in our pleading as well. And the complaint that we filed on the, uh, in the district court in Florida, that I missed that. We've, we've argued that, uh, constantly that there's a conflict of interest because it was the, the company's own money. And the second thing, did you put in any evidence of that? It was the Supreme court requires more than just the, the fact that the union company's paying out more money, it requires additional evidence. Well, all I can say to this, your honor, is that when, when the appeals committee of this company wrote a letter to us saying that they were not going to honor this claim, they couched it in the following way. We are unable to pay. We are unable to approve this claim. What do they mean by they're unable to, of course they're able to, they decided not to, it was their own money and they decided not to spend their own money. There was no inability to pay and they had no, it's not a situation where they had no choice, but to deny the claim. They had a choice. They decided not to do it. We have a problem. This is one statute. There is a statute. And depending upon where we are in the country, in this case, because, uh, miss, uh, this Alexandria and her husband lived in, uh, in Boston, they are subject to the regime established by this court in Wickman. If they had lived in Atlanta, Georgia, they wouldn't have had this problem with the same policy. Counsel, that's time. Okay. Thank you very much. It's been a privilege. Thank you. Thank you. That concludes arguments for today. This session of the honorable United States court of appeals is recessed until the next session of the court. God save the United States of America and this honorable court council, please disconnect from the meeting at this time.